

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BOARD OF EDUCATION OF TOWNSHIP HIGH SCHOOL DISTRICT NO. 211, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL R. and DIANE R., individually and as next friends of LINDSEY R., a minor, <br><br> Defendants, <br><br> ILLINOIS STATE BOARD OF EDUCATION, <br><br> Third Party Defendant. | Case No. 02 C 6098 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Michael R. and Diane R. are the parents of Lindsey, an eighteen year-old girl who has

Rett Syndrome, a neurological and developmental disorder that is characterized by the absence of

verbal ability, gait disturbances, and apraxia, an inconsistent ability to control the body and

limbs. The Individuals with Disabilities Education Act, 20 U.S.C. § 1414, guarantees Lindsey

the right to a free appropriate public education (FAPE) in the least restrictive environment. The

IDEA obligates Lindsey's home school district, District 211, to assess her educational needs and

address those needs through an individualized education program. *Id.* § 1414(a)-(d).

In November 2003, the District concluded that Lindsey was not receiving a FAPE in the

District's mainstream high school, Conant High School, and it therefore determined that she should be placed in a highly structured, multi-needs environment in a different school. Lindsey, acting through her parents, appealed the District's placement decision to an independent hearing officer (IHO). The IHO decided that the District's placement determination was appropriate. Defendants, Lindsey's parents, now seek to have the Court overturn the IHO's decision.

Both the District and defendants have moved for summary judgment. There are many disputed material facts in this case, which ordinarily would preclude summary judgment. Fed. R. Civ. P. 56(c). In IDEA cases, however, motions for summary judgment are a procedural vehicle allowing the district court to rule on the case based on the administrative record. Thus, it is appropriate for the court to grant summary judgment even when facts are in dispute. *Beth B. v. Van Clay*, 282 F.3d at 493, 496 n. 2 (7th Cir. 2002).

For the reasons stated below, the Court grants summary judgment in favor of the District. Defendants' motion to strike the District's reply to defendants' response to the District's Rule 56.1(b)(3) statement of material facts is granted, because the local rules do not contemplate replies to responses of Rule 56.1(b)(3) statements. The Court did not consider that reply in addressing the present motions.

## Standard of Review

In reviewing the findings made in an IDEA administrative hearing, courts are directed to give "due weight" to the decision of the IHO. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). "'Due weight necessarily implies some sort of deference to the agency's decision, and considering the officer's special expertise in education law, we think a sound basis exists for giving deference to the decision of the hearing officers.'" *Id.* (citing *Board of*

2

*Education of Murphysboro Community School Dist. No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1167 (7th Cir. 1994)). The testimony of witnesses and evidence submitted at the hearings, however, should be independently evaluated by the court. *Id.* at 1053; *see also Patricia P. v. Board of Education of Oak Park*, 203 F.3d 462, 466 (7th Cir. 2000) (the "due weight" standard does not imply an "abdication of all judicial function"). A court must, however, be mindful of the fact that hearing officers have much greater expertise in educational policies than district court judges, *Heather S.*, 125 F.3d at 1053, and thus, the court may set aside the administrative order only if it is "strongly convinced the order is erroneous." *Alex R. v. Forrestville Valley Community Unit School Dist. No. 221*, 375 F.3d 603, 612 (7th Cir. 2004).

The court is required to examine the administrative record, hear additional evidence at its discretion, and base its decision on the preponderance of the evidence. 20 U.S.C. § 1415 (i)(2)(B). In this case, the Court allowed Lindsey's parents to adduce some new evidence following the administrative ruling. When a court permits the introduction of new evidence, the more the court relies on this new evidence, "the less it should defer to the administrative decision." *Alex R.*, 375 F.3d at 612. The new evidence in this case consisted of three depositions. The testimony contained in these depositions did not provide the Court with any new material information. Indeed, the information contained in the depositions was largely duplicative of information already in the administrative record. Thus, the new evidence did not warrant a more searching review of the IHO's decision.

In the administrative hearing, District 211 bore the burden of proving its proposed individualized education program (IEP) was adequate. 105 ILCS 5/14-8.02(h). In this proceeding, however, as the party challenging the IHO's decision, the defendants bear the burden

3

of proving their case by a preponderance of the evidence. *Heather S.*, 125 F.3d at 1052. The preponderance of the evidence standard "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

### Facts

Lindsey was diagnosed with Rett Syndrome when she was thirty-five months old. Rett Syndrome is a rare condition, affecting approximately one in every ten to fifteen thousand girls. Vol. 22 at 3701. It is classified by the American Psychiatric Association as one of several "pervasive developmental disorders," also referred to as the autism spectrum. Diagnostic and Statistical Manual of Mental Disorders 71 (4th ed. 1994). Rett Syndrome is caused by a genetic mutation which affects the overall rate of growth, including brain growth.

Lindsey is nonverbal and suffers from apraxia, an inconsistent ability to control the body and limbs. She has, however, a higher level of motor functioning than the majority of girls with Rett Syndrome; among other things, Lindsey can swim, ski, and ride a horse. Vol. 24 at 7338. Lindsey also has a higher level of cognitive functioning than most girls with Rett Syndrome. Though the average mental age of girls afflicted with Rett Syndrome is estimated to be eight to ten months, doctors estimate Lindsey's cognition to be between the seven and twelve year old equivalency. Vol. 21 at 2901 (one test showed that Lindsey had the cognitive abilities of at least a seven year old, and another showed she had the cognitive ability of an average twelve year old). It should be noted, however, that because girls with Rett Syndrome are nonverbal and have poor motor control, it is quite difficult to measure their cognitive ability accurately.

Among the many effects of Rett Syndrome are that Lindsey's hands get locked together,

and she needs assistance in unlocking them. In addition, and perhaps significantly for purposes of this case, Lindsey engages in vocalizations, which can be loud and last for anywhere from a few seconds to over a minute. The cause and meaning of the vocalizations is not known with any certainty. Rett Syndrome also causes Lindsey to engage in self-injurious behaviors, which include hitting herself on the chin or head, the cause of which is also unknown. Lindsey also sometimes strikes others, usually by butting them with her head.

Lindsey is a resident of Schaumburg, Illinois. She was "mainstreamed," that is, placed in her regular neighborhood schools, throughout elementary and junior high school. After graduating from junior high, Lindsey started high school at Conant, her neighborhood high school. Conant is one of five District 211 high schools. It is a large, crowded high school, with a population of approximately 2,638 students. Conant does not have a self-contained multiple needs program. District 211 has a multiple needs classroom at another school, Hoffman Estates High School.

Lindsey entered Conant as a freshman in the fall of 2001. Her schedule included five regular education classes – physical education, biology, English, life studies, and math – and lunch. She had her own special education teacher and teacher's aide who accompanied her throughout the day. The teacher was responsible for modifying the curriculum to Lindsey's cognitive level and communication skills. The teacher and the aide were responsible for transitioning Lindsey to and from class and working with Lindsey during class. If Lindsey needed to be removed from class because of her behavior, the teacher and the aide would attempt to calm her using various techniques such as talking to her, rubbing her back, playing music, applying splints, and using a weighted vest and blanket. Lindsey had extensive toileting needs,

5

to which her teacher and the aide attended. In addition, because she is nonverbal, Lindsey required numerous communication devices, such as yes/no cards, an alphabet board, and voice output devices, and the teacher and the aide had to help Lindsey use the devices.

Conant made a work room available for Lindsey's private use. The work room was a place where Lindsey could go to receive individualized instruction from her special education teacher, receive speech and physical therapy, or calm herself when her behaviors required removal from class.

In May of Lindsey's freshman year, she head-butted two staff members, causing them to sustain nasal fractures, one of which required surgery. Following these incidents, Lindsey was taken out of Conant. Over the summer of 2002, Lindsey's parents took her to the Sparks Clinic in Alabama, a clinic run by Dr. Alan Percy, an expert in Rett Syndrome, for a medical evaluation to determine the cause of her "behavior and irritability." Vol. 24 at 7245. Dr. Percy could find no physical cause for Lindsey's behavior and recommended continued evaluation by her doctors in Chicago.

Also in the summer of 2002, the District completed its IDEA-required triennial evaluation of Lindsey. The multidisciplinary review was conducted by Dr. Bennett Leventhal and Dr. Marrea Winnega at the University of Chicago Developmental Disorders Clinic. After closely examining Lindsey, the Clinic concluded that Lindsey's behaviors were grossly interfering with her ability to make educational progress. Vol. 11 at 3788 (the report notes that it was difficult to assess Lindsey's cognitive potential during the review because her behavior interferes with her ability to respond and the ability of staff to work closely with her). At the conclusion of the multidisciplinary review, the University of Chicago doctors recommended that

6

Lindsey be taken out of Conant and placed in a special education setting:

> Regrettably but realistically, due to Lindsey's behavior and general lack of progress, it is not appropriate for Lindsey to continue in her current, so-called regular education setting. Not only does she not benefit, but she has also become a significant and serious safety problem for herself and others. She is not safe around her teachers or fellow students.

> At this time, the least restrictive setting for Lindsey should be a self-contained special education program that has very strong behavioral training capabilities.

Vol. 11 at 3790.

The District held a meeting in August 2002 to create Lindsey's IEP for the 2002-03 school year. The District recommended a self-contained special education placement for Lindsey. Lindsey's parents refused to agree to that placement, as they believed Lindsey was best served in the regular education setting at Conant. They requested an administrative hearing to review the District's placement decision and made it clear that they would exercise the "stay put" provision of the IDEA. 20 U.S.C. § 1415(j). This provision permits a student who is eligible for special education services to remain in her current educational placement while a due process hearing is pending. The District filed suit, asking this Court to enjoin Lindsey's parents from invoking the stay put provision. The Court granted a temporary restraining order. Rather than put Lindsey in a special education placement after the injunction was granted, defendants elected to keep her at home.

The District and Lindsey's parents thereafter negotiated regarding Lindsey's placement. The parties reached a compromise and executed a settlement agreement on November 5, 2002. Vol. 5 at 1945. The agreement provided that Lindsey was to return to Conant as soon as possible. A panel of experts was established with the task of preparing Conant for Lindsey's return and reaching a consensus regarding if and when Lindsey should return to the school. Vol.

5 at 1959. If the panel could not reach a consensus regarding Lindsey's return to Conant, the agreement provided that the dispute could be resolved before a hearing officer or by this Court. *Id.*

The expert panel was composed of three members, Dr. Bennett Leventhal, Victor Morris, and Alice Belgrade. Dr. Leventhal, an adolescent psychiatrist and pediatrician, was the doctor at University of Chicago Clinic who had evaluated Lindsey for the triennial evaluation. Dr. Leventhal also relied on the services of Dr. Winnega, the director of the Clinic, who had also participated in the triennial evaluation. Victor Morris, a specialist in educational and behavioral programming for students with autism spectrum disorders, worked for the North DuPage Special Education Cooperative and owned his own consulting firm. He also consulted with Dr. Mark Lenz, another member of his consulting firm. Alice Belgrade was the only member of the panel with teaching experience. She founded Chicago Behavior Consultants and was a behavioral specialist retained by Lindsey's parents to work with Lindsey at home. Morris was chosen to lead and coordinate the panel. The panel members divided up tasks based on expertise. Dr. Leventhal would review medical records and provide medical consultative support; Vic Morris would review the Conant environment and develop strategies that would work in the environment; and Belgrade would continue to work with Lindsey at home to shape her behaviors and would develop a behavior intervention plan for use at school.

Though seemingly well organized, the panel's activities seemed "star-crossed" from the beginning, according to the hearing officer. IHO Decision at 48. The panel members had trouble communicating with each other quickly and reliably. *Id.* Furthermore, the panel members had fundamental disagreements over Rett Syndrome; whether there was a correlation between

"precursory behaviors" and the occurrence of vocalizations, self-injurious behavior, and head-butting; whether Lindsey's environment caused or affected the severity of these behaviors; and whether a plan developed by a behavioralist to minimize their frequency and intensity could be effectively implemented at Conant. *See* IHO Decision at 48-50 (listing some of the disagreements between panel members).

Despite their differences of opinion, the panel members agreed that Lindsey should return to Conant in spring 2003. Lindsey returned to Conant on April 21, 2003 with a shortened schedule of three periods which included lunch, physical education, and English. Conant hired Jean Mansfield Link to be Lindsey's special education teacher and Donna Frascati to be the teacher's aide.

Lindsey attended school for thirty-five days in the spring of 2003. Link kept detailed daily and weekly logs of Lindsey's experiences at Conant. *See* IHO Decision at 24-27 (summarizing the weekly logs). The logs reflect that Lindsey spent most of her time in her work room, rather than in classroom, often because self-injurious behavior and vocalizations required her removal from class. Of the thirty-five days Lindsey was at school, she was able to stay in English class for the full fifty-minute period only twice. *Id.* at 24. Though her academic progress was limited, Lindsey made progress in functional skills such as using a spoon, improving her sorting skills, responding to personal greetings, and developing proper hygiene. *Id.* at 30.

Lindsey completed her sophomore year in June 2003. During summer 2003, Jean Link informed Conant that she was quitting her job to take a teaching position at a special education school. With Link leaving, Conant decided not to rehire Donna Frascati. In their place, Conant

hired Bethany Powers as Lindsey's special education teacher and Nora Mulcrone as an aide.

Also in June 2003, the panel began to contemplate setting a time at which it would complete its work under the settlement agreement and thereafter dissolve. The panel discussed other placement options for Lindsey, such as the special education program at Hoffman Estate High School, but the panel members did not investigate these placements because they believed the settlement agreement limited them to working with Conant. IHO Decision at 33. The panel did not make a specific recommendation regarding what Lindsey should do during the summer or what her class schedule should be in the fall. Vol. 21 at 2262.

On August 7, 2003, the IEP team met to start working on Lindsey's IEP for her junior year of high school. The IEP team consisted of Lindsey's parents and their attorney, Jennifer Pearson, the assistant director of special education for the District, the District's attorney, Belgrade, Morris, Scott Altergott, Lindsey's English teacher, and Lindsey's physical therapist.[1] Vol. 1 at 142. At the meeting, Morris unexpectedly announced his resignation from the panel. He explained he was resigning because he was concerned with the continuing effectiveness of the panel and differences in perspective between himself and Belgrade regarding how best to support Lindsey. Vol. 21 at 2266. At the time of his resignation, Morris believed that Lindsey had participated successfully at Conant with her limited schedule. Belgrade essentially agreed with Morris and believed that Lindsey should begin taking more academic classes in the fall. Dr.

[1]The IDEA provides that an IEP team must include the parents of the disabled child; not less than one regular education teacher of the child; not less than one special education teacher; and a qualified and knowledgeable representative of the school district. 20 U.S.C. § 1414(d)(1)(B). The IDEA does not restrict the team to these members, however, and other teachers, school administrators, and experts knowledgeable about the disabled may be included in the team at the discretion of the school district or parents. Id.

Leventhal, however, was not convinced that Lindsey's time at Conant in the spring was appropriate. He was concerned about her vocalizations and behaviors and believed that if the behavioral disruptions could not be controlled, Lindsey should be removed from Conant. Vol. 22 at 3944.

The next IEP team meeting occurred on August 15, 2003. Conant's representatives on the team believed that Lindsey should be placed in a self-contained, special education setting; however, they did not recommend such a placement because they felt constrained by the settlement agreement. Lindsey's parents and Belgrade wanted Lindsey to return to Conant with a full day of classes in the fall. The IEP team acquiesced to the demands of Lindsey's parents, and Lindsey began school on August 27, 2003 with a six period day that included English, earth science, foods, physical education, lunch, and a resource period.

From the beginning of the 2003-04 school year, Lindsey behaved differently than she had in the spring. IHO Decision at 40. She took progressively longer to get to class, sometimes taking as much as twenty minutes to walk from her work room to classroom. As a result, Lindsey was generally late to class. In addition, Lindsey often had to be removed from class due to her vocalizations and other behaviors. Furthermore, Lindsey suffered from medical problems including an impacted bowel and a yeast infection. She also seemed fatigued and unsteady on her feet, and her motor skills appeared to have deteriorated. Because of medical and behavioral problems, Lindsey was in school for the full six periods on only five days during September and October 2003.

Concerned by Lindsey's behavior, the District sought help from the panel members. By this point, however, the panel was no longer actively involved in Lindsey's case, though it had

11

not formally dissolved. Morris, Belgrade, and Dr. Winnega agreed to observe Lindsey in school. Morris and Belgrade observed on October 16, and Dr. Winnega observed on October 31. The IEP team held a meeting on November 5, 2003, which Morris, Belgrade, and Dr. Winnega attended in order to share their observations. Morris told the team that he believed Conant was not the appropriate placement for Lindsey and that she should be placed in a self-contained special education setting. Vol. 21 at 2274-77. Dr. Winnega agreed; she felt Lindsey needed to be removed from Conant as soon as possible. Vol. 6 at 2229. Belgrade continued to recommend that Lindsey remain in her current placement at Conant. *Id.* at 2228. Lindsey's regular education teachers, speech therapist, special education consultant, and the Conant administrators present at the IEP meeting all agreed with Morris and Dr. Winnega that Lindsey's needs were not being met at Conant. *Id.* at 2226-30.

At the end of the meeting, the District decided that Lindsey was not benefitting from Conant and changed her placement to a "multiple needs program" for disabled students that would provide "a safe environment and protective strategies"; would have the capacity "to conduct sophisticated behavior analysis and create behavioral inventions"; and would provide opportunities for Lindsey to interact with nondisabled peers. Vol. 6 at 2239. Though the District did not specify which school contained a multiple needs program appropriate for Lindsey, it recommended Lake Park High School, a multiple needs program run by the North DuPage Special Education Cooperative. *Id.* at 2240. Lindsey's parents disagreed with the placement and sought review of the District's decision in a due process hearing.

The IDEA provides for review of a school's placement decision in a hearing before an IHO. 20 U.S.C. § 1415(b)(6); 105 ILCS 5/14-8.02. Carolyn Smaron was appointed as IHO for

Lindsey's case. The IHO heard forty-two days of testimony, the longest special education due process hearing in Illinois history. Following the hearing, the IHO issued a sixty-one page decision in which she concluded that the District's placement decision was appropriate. Lindsey's parents, the defendants in this action, have appealed the IHO's decision to the Court, as is their right. 20 U.S.C. § 1415(i)(2)(a). In addition to asking the Court to overturn the IHO's decision and order for Lindsey to again be placed at Conant, defendants ask the Court to direct the District to hire an independent behavior specialist, chosen by defendants and approved by the Court, to develop a functional behavioral analysis and behavior intervention plan; pay the behavior specialist to provide ongoing training and consultation to District staff and Lindsey's parents and have ongoing authority over the implementation of Lindsey's program at Conant; and award Lindsey two years of compensatory education following her graduation from or "aging out" of Conant.

The parents have also filed a cross-claim against the Illinois State Board of Education in which they allege that the ISBE violated the IDEA, Americans with Disabilities Act, and section 504 of the Rehabilitation Act by failing to ensure that the District educate Lindsey at Conant. In the cross-claim, Lindsey's parents ask the Court to direct the ISBE to implement targeted monitoring of the District for IDEA compliance and to oversee Lindsey's placement to ensure compliance with the IDEA and Lindsey's IEP.

### Rowley Requirements

The IDEA guarantees children with disabilities the right to a FAPE. 20 U.S.C. § 1412(a)(1). The Supreme Court has articulated a two-part test to determine whether a school has fulfilled its duty to provide a FAPE: (1) has the school district complied with the procedures

13

provided by the IDEA; and (2) is the student's IEP reasonably calculated to provide educational benefits. *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982). If the school district fails either part of the *Rowley* test, the student's right to a FAPE has been denied.

For ease of analysis, the Court will address defendants' *Rowley* claims according to the time period in which they arose.

### 1.    December 2002 to June 2003

December 2002 to June 2003 is the time period subsequent to the signing of the settlement agreement, which includes the preparation for Lindsey's return to Conant and Lindsey's attendance at Conant for the last six weeks of her sophomore year.

#### a.    Procedural requirements

Defendants do not allege any procedural violations during this time period.

#### b.    Substantive requirements

Defendants assert that Lindsey's sophomore year IEP was not implemented properly. The settlement agreement made Lindsey's August 2002 IEP her current IEP when she returned to Conant in spring 2003, including all of the goals and objectives contained therein, except for any modifications made by the expert panel. Vol. 5 at 1953. Lindsey's August 2002 IEP identified many needs and services that she required, and according to defendants, the District failed to meet these needs and provide these services.[2]

Specifically, defendants argue that the District failed to carry out the portion of Lindsey's IEP which called for a development of a transition plan. The purpose of a transition plan is to

---

[2]The IDEA regulations contain an extensive list of goals and services that must be included in an IEP, including transition services, assistive technology evaluation and services, and extended school year services if appropriate. 34 C.F.R. §§ 300.29, 300.6, & 300.309.

formulate a plan for a student to transition to post-school life. 34 C.F.R. § 300.29(a)(1). The record reflects that Lindsey's transition plan was "deferred." Vol. 23 at 4961. The District explained, however, that it is common practice to defer a transition plan if the school has not gotten to the point where one can be written, i.e., the student is not ready to transition. *Id.* The District has yet to develop a transition plan for Lindsey because, in its professional opinion, Lindsey is not ready for prevocational screening, learning about interview strategies, and strategies for living on her own. The preponderance of the evidence supports the District's decision to defer Lindsey's transition plan. Because Lindsey needs significant assistance in performing basic daily activities, has a limited ability to communicate, and frequently displays aggressive behaviors, it was reasonable for the District to determine that Lindsey has not yet progressed to the point at which a transition plan is necessary.

Defendants also point to the requirement in Lindsey's 2002 IEP for an updated assistive technology (AT) evaluation and updated technology services. The IDEA requires school districts to provide AT services, including evaluation of a child's AT needs, purchase of appropriate AT devices, adapting AT devices, and training of the child and staff on the use of AT devices. 34 C.F.R. § 300.6(a)-(f). Lindsey's AT evaluation, however, was not completed until February 2003, which defendants say amounted to an undue delay in providing Lindsey important services. Defendants also contend that once the AT evaluation was completed, the District failed to implement many of the evaluators' recommendations. For example, defendants note that the District did not call a team meeting or IEP meeting to discuss the AT evaluation, Vol. 25 at 9304, and did not provide Lindsey with a device called Tech/Talk, which the AT evaluator, Kathleen Post, recommended as the appropriate voice output device for Lindsey. Vol. 24 at 7632.

Lindsey was not denied a FAPE because of the District's delay in providing an AT evaluation. Lindsey did not return to school until April, and thus, completion of the AT evaluation in February gave the expert panel and the District sufficient time to consider the evaluation. Furthermore, the District was not obliged to follow all of the AT evaluator's recommendations, particularly when specialists who worked with Lindsey made different recommendations. *Beth B. v. Van Clay*, 211 F. Supp. 2d 1020, 1027 (N.D. Ill. 2001) (in holding that the school district's failure to follow the advice of an independent Rett Syndrome expert it consulted did not violate the IDEA, the court stated that a school administrators are "not obliged to follow anyone's advice" because they "do not relinquish their authority to make educational policy decisions by agreeing to consider an independent consultant's opinion"). The District explained that it did not follow Post's recommendation of Tech/Talk as the appropriate voice output device because Phyllis Duffie, the AT consultant working with Lindsey at Conant, recommended SuperHawk. Vol. 24 at 7676-78.

The IDEA also requires school district to provide extended school year services (ESY) to a student if the IEP team determines they are necessary for the provision of the child's FAPE. 34 C.F.R. § 300.309(1)-(2). Defendants claim that the District failed to fulfill its obligation to give Lindsey ESY services in the summer of 2003 despite the fact that her IEP provided for ESY. At the due process hearing, however, witnesses testified that school administrators and panel members worked on finding Lindsey an appropriate summer program. Vol. 21 at 2483-97. The District offered to place Lindsey in the regular education four hour per day summer school program, but defendants refused this placement because they wanted to put Lindsey in a summer camp, where they felt she would have more of an opportunity to socialize. Defendants had every

right to make this decision, but it is disingenuous for them to now assert that the District failed in its duty to provide ESY services.

**2.    August to November 2003**

This period of from August through November 2003 covers the formulation of Lindsey's August 2003 IEP and her attendance at Conant as a junior in the fall of 2003.

**a.    Procedural requirements**

Defendants argue that the District violated the procedural requirement of the *Rowley* test by denying them the opportunity to participate in Lindsey's IEP meeting. The cornerstone of the IDEA is the development and implementation of the IEP. *Honig v. Doe*, 484 U.S. 305, 311 (1988). Because of the importance of the development of the IEP, the IDEA contains an extensive list of procedural requirements school districts must follow. One of these requirements is parental participation in the development of the IEP. 34 C.F.R. § 300.345(a). Parents have the right to be members of "any group that makes decisions on the educational placement of their child," 20 U.S.C. § 1414(f), including the team that produces the IEP. 20 U.S.C. § 1414(d)(1)(B). School districts are responsible for ensuring that parents are afforded an opportunity to participate at each IEP meeting. 34 C.F.R. § 300.345(a).

Defendants argue that they were denied an opportunity to participate in the formulation of Lindsey's August 2003 IEP because the District made an addendum to Lindsey's August 2003 IEP without consulting them. The addendum stated:

> By the end of her ninth grade year, in addition to the daily possibility of serious physical injury being inflicted on its staff, staff members who worked closely with Lindsey sincerely believed she was receiving virtually no educational benefit in the mainstream. Based on these beliefs, public school personnel recommended a placement at a separate school designed to appropriately meet Lindsey's needs. The family disputed this

17

recommendation. For weeks, the family and school district engaged in sometimes difficult discussions and negotiations. Ultimately, these cooperative efforts resulted in the settlement agreement that now controls.

However, the belief among District 211 staff that Lindsey is not being appropriately served in the mainstream still exists. Staff members directly involved with Lindsey continue to believe that the appropriate education placement for Lindsey is a public or private day or residential setting designed to provide the type of specialized instruction and integration of related services necessary for students with Lindsey's complex needs. However, staff is also advised by legal counsel that the settlement agreement continues to control and therefore they will in good faith implement whatever IEP is agreed upon today. Were it not for the settlement agreement, as a matter of conscience, public school personnel would continue to recommend an appropriate public or private self-contained setting.

Vol. 6 at 2125-26. The District admits that the addendum was written during a break in the IEP meeting and was not discussed with Lindsey's parents before putting it into her IEP. Vol. 22 at 4371-71.

Though the Court does not believe the addendum amounted to a procedural inadequacy, even if it was, it did not rise to the level of an IDEA violation. Not all procedural breaches are IDEA violations. The Seventh Circuit has held that only "procedural inadequacies that result in the loss of educational opportunity" constitute a denial of FAPE. *Evanston Community Consol. School Dist. No. 65 v. Michael M.*, 356 F.3d 798, 804 (7th Cir. 2004); *Edwin K. v. Jackson*, No. 01 C 7115, 2002 WL 1433722, *14 (N.D. Ill. July 2, 2002). Lindsey clearly did not suffer a loss in educational opportunity because of the addendum; her time at Conant was actually doubled in the August IEP meeting.

Defendants assert that procedural inadequacies can also violate FAPE if they "seriously infringe the parents' opportunity to participate in the IEP formulation process." *W.G. v. Bd. of Trustees*, 960 F.2d 1479, 1484 (9th Cir. 1992); *Roland M. v. Concord School Community*, 910

F.2d 983, 994 (1st Cir. 1990); *Hall by Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985). The Seventh Circuit has thus far declined to adopt this standard. *Michael M.*, 356 F.3d at 804. But, even if the Seventh Circuit had done so, this Court's decision would not change. Defendants' right to participate actively was not infringed, as shown by the fact that the IEP contained the exact program the defendants advocated, i.e., it increased Lindsey's school schedule from three periods to a full day of six periods. Because the District fully adopted defendants' proposed schedule for Lindsey in the August 2003 IEP, defendants cannot show that they were denied a meaningful opportunity to participate in the IEP meeting.

### 2. Substantive requirements

Defendants claim that Lindsey's August 2003 IEP was not formulated or implemented by the District in a way that provided Lindsey with educational benefit. They base this claim on the change in Lindsey's behavior from spring 2003, when defendants argue Lindsey greatly benefitted from her time at Conant, to fall 2003, when it is undisputed that her behavior and academic functioning declined. Defendants place the blame for Lindsey's deterioration on the District's alleged failure to support Lindsey in the fall. Specifically, defendants argue that the District failed to provide Lindsey with adequate staff, staff training, and services. The District, however, argues that the actions of its staff and administration had nothing to do with Lindsey's deterioration in fall 2003. Rather, the District argues, Lindsey's behavior at Conant had always been a problem and deteriorated in the fall because Conant was not the appropriate environment for dealing with her complex needs.

A key ground for defendants' assertion that Lindsey was not properly supported and their contention is that Lindsey's teacher and aides failed to correctly implement Lindsey's behavioral

19

and academic plans. Defendants argue that Bethany Powers and Nora Mulcrone were inadequate teachers as compared to Jean Link and Donna Frascati, Lindsey's staff in the spring. In determining whether the District and its staff fulfilled their duty under *Rowley* to appropriately implement Lindsey's IEP in fall 2003, the Court must keep in mind that the IDEA does not guarantee a disabled child the best possible educational experience. *Bd. of Educ. of Murphysboro Community*, 41 F.3d at 1166 (school districts "are not required to educate the child to his or her highest potential"). Rather, the statute provides a basic floor of opportunity for disabled children to attend public school. *Rowley*, 458 U.S. at 200; *White*, 343 F.3d at 378 ("A FAPE need not maximize the child's potential; it must guarantee a basic floor of opportunity.").

In comparing Lindsey's experiences at Conant in spring and fall 2003, it appears that in spring 2003, Lindsey enjoyed an exceptional educational experience at Conant, at least in part because of the outstanding skills possessed by Link and Frascati. As described by Lindsey's mother, and undisputed by the District, Jean Link had a very special rapport with Lindsey. Vol. 26 at 9355-67. Lindsey's mother testified that Link was "phenomenal" at assisting Lindsey in communicating, *id.* at 9367, created communication devices that were similar to those created by communication experts, *id.*, and created an "unbelievable" amount of academic materials for Lindsey. *Id.* at 9368. Lindsey's experience with Link appears to have approached the ideal. But the IDEA does not guarantee a phenomenal teacher for every child with a disability. After Link chose to leave Conant for a different teaching position after the end of the 2002-03 school year, the District hired Bethany Powers, an experienced special education teacher,[3] to replace her.

---

[3]Powers worked as an aide for special needs students in District 54 for four summers. Vol. 21 at 1437. After graduating from college, she worked for NSSEO as an inclusion teacher for a child with a severe learning disability who was fully included in the mainstream school. *Id.*

Powers attended training at Conant for working with Lindsey, did her own research on Rett Syndrome, met with Lindsey before the beginning of the school year, kept detailed behavioral logs during the school year, and made a good faith effort to carry out Lindsey's IEP. The fact that Powers may not have had the same extraordinary rapport with Lindsey that Link had does not suggest that the District failed to adequately implement Lindsey's IEP.

Defendants also assert that Lindsey was not given communication devices on a consistent basis in fall 2003, as recommended by the expert panel and the February 2003 AT evaluation. The result, according to defendants, was Lindsey's display of negative behavior. Defendants base their assertion that Lindsey was not given consistent access to communication devices on the fact that when Belgrade and Morris observed Lindsey on October 16, they saw Powers fail to provide Lindsey with a communication device on several occasions. Vol. 25 at 8739, 8533; Vol. 21 at 2344.

Though unfortunate, the fact that Powers and her teacher's aides forgot to provide Lindsey with a communication device after asking her a question six times on the one day Belgrade and Morris were observing does not lead to a finding that the District failed to provide Lindsey with an IEP reasonably calculated to provide her educational benefit. First of all, there is evidence from Belgrade and Morris that they observed Powers providing Lindsey with communication devices and taking those devices to class with her on the day they observed. Vol. 25 at 8737. Powers testified at the hearing that she consistently used communication devices with Lindsey and that she programmed Lindsey's voice output device. Vol. 21 at 1593, 1609. Maria Fasolo, Lindsey's speech and language pathologist, also testified that Lindsey had access

at 1441. She also taught multiple needs summer school in a self-contained setting. *Id.* at 1437.

to communication devices in fall 2003. Vol. 20 at 1111. Dr. Winnega also testified that after she observed Lindsey at school two weeks after Morris and Belgrade, she saw nothing that indicated Powers was an ineffective teacher. Vol. 21 at 1960.

Defendants also argue that the District denied Lindsey a FAPE by failing to appropriately implement her behavior intervention plan, as contrasted with the appropriate implementation by the spring 2003 staff at Conant. According to defendants, Powers and her aides implemented Lindsey's BIP inconsistently and too often focused on restrictive strategies such as prematurely removing Lindsey from the classroom, encouraging her to go to the workroom, and using splints. Furthermore, defendants argue that the staff failed to collect behavioral data in a way that could be used to develop new strategies, which was, defendants say, the fault of the District for failing to train the staff on proper data collection.

The Conant staff may have been less than perfect in implementing Lindsey's behavior plan in fall 2003, but it made a good faith effort to implement the plan and kept detailed logs of Lindsey's behavior. As we will discuss later in this decision, the root of the problem in implementing the plan was not the staff, but the complexity of Lindsey's plan and the difficulties of carrying it out in a large, regular education high school. Indeed, Dr. Leventhal and Dr. Winnega recognized the difficulty in implementing a behavior plan for Lindsey at Conant as early as summer 2002 when they performed the triennial evaluation. Indeed, the triennial evaluation stated that the type of intensive behavioral management program Lindsey needed "was not going to be able to be done in that setting [Conant]." Vol. 21 at 2136, 2190-92. The District cannot be held to a standard of perfection in implementing Lindsey's difficult behavioral intervention plan at Conant. *See also* Vol. 21 at 2273 (Morris testified that complex behavioral

22

programs such as Lindsey's, which are "based on flawless or very high levels of implementation as a requirement of their effectiveness are generally going to be ineffective in school settings because there are always error in implementation"); *id.* at 2136 (Dr. Winnega testified that the "intensive behavior management" Lindsey needed "was not going to be able to be done" at Conant). The preponderance of the evidence supports the IHO's conclusion that the District's staff appropriately implemented Lindsey's behavior plan under challenging circumstances.

According to defendants, the District made numerous other mistakes in implementing Lindsey's IEP, including decreasing her speech and physical therapy services, Vol. 6 at 2038, failing to create social stories[4] in fall 2003, Vol. 21 at 1812, failing to provide music therapy, Vol. 6 at 2026, and failing to provide her with a properly fitting weighted vest as her IEPs required, Vol. 26 at 9706. None of these contributed materially to the failure of Lindsey's IEP to provide her with meaningful educational benefit in the fall of 2003. In fact, many of the same alleged deficiencies also existed in the spring of 2003, when, defendants say, Lindsey experienced significant educational at Conant. For example, in spring 2003, only one social story was developed and used. Vol. 23 at 5758. The lack of new social stories in the fall cannot be said to have significantly contributed to the problems Lindsey had in the fall. Lindsey also did not have music therapy or a properly fitting vest in spring 2003.

Defendants also claim that the District failed to carry out the IEP in good faith. This claim is based on a letter written by Dr. Dan Cates, director of special education for the District, in March 2003, even before Lindsey returned to Conant in spring 2003. The letter stated that Dr.

---

[4]"Social stories" are stories describing individuals in social situations and explaining how they behave in order to assist a student in understanding and demonstrating appropriate behavior in anticipation of or in reaction to specific situations.

Cates would be advising school personnel working with Lindsey when she returned to Conant to wear football helmets out of concern for their safety. Vol. 9 at 3074. The letter was addressed to the members of the expert panel. A copy of the letter was sent to defendants, and they were understandably offended and upset. Defendants argue that this letter demonstrates the District's lack of a good faith effort to make Lindsey's program at Conant work. Vol. 26 at 9317. They also assert that this letter poisoned the minds of staff members at Conant and made it clear that Lindsey was not wanted thre. Vol. 24 at 6850. Dr. Cates testified at the administrative hearing, however, that the letter was never shared with any staff member of Conant. Vol. 24 at 6470. He also stated that the letter was hyperbole, meant to "invoke deliberation from panel members." Vol. 23 at 5350. Dr. Cates testified that he was seriously concerned about the safety of his staff after the incidents in Lindsey's freshman year – the two broken noses – and wanted the panel to fully consider safety issues before Lindsey's return to Conant. *Id.* at 5351. He said he never actually planned, and never arranged for the staff to actually wear helmets. Vol. 24 at 6492.

Regardless of the Dr. Cates' claimed intent, his letter was inappropriate. It is not indicative, however, of a violation of the IDEA. The preponderance of the evidence supports the IHO's conclusion that Conant administrators and staff acted in good faith in attempting to carry out Lindsey's IEP. Moreover, Dr. Cates' letter was written *before* Lindsey's return to school in spring 2003. Thus, if the letter actually had an effect on Lindsey's program, one would expect to have seen it in spring 2003. According the defendants, however, the spring 2003 term is what proved that Lindsey could be successfully mainstreamed at Conant.

In sum, defendants have failed to show that the school district failed to implement substantial or significant provisions of Lindsey's IEP. Defendants have shown, at most, a *de*

24

*minimis* failure to implement all elements of Lindsey's IEP. The Court cannot say that Lindsey was denied a FAPE. *Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) ("to prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of the IEP, and instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP"). The preponderance of the evidence reflects that the District exercised its professional judgment and good faith in producing and implementing Lindsey's IEP.[5]

### 3. November 2003

#### 1. Procedural requirements

Defendants accuse the District of predetermining Lindsey's placement in the November 2003 IEP meeting. The IDEA requires that a placement decision be based on the IEP. In other words, the placement decision must be based on the IEP produced by the IEP team and cannot be made before the IEP is produced. *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 258-59 (4th Cir. 1988). A unilateral decision to change a student's placement before the IEP meeting with the student's parents, referred to as "predetermination," can constitute a violation of

---

[5]The Court agrees with the IHO's statement that:

[T]he school district developed Individualized Education Plans for the student who appeared in their building - a student with limited ability to communicate without utilizing augmentative communication, a student whose behavior actively interfered with her own education and the education of her fellow students and a student with limited body control (apraxia). The school district exercised its professional judgment as to how best to educate the student.

IHO Decision at 58.

the IDEA. *Id.* at 259. Defendants claim that the District did exactly that.

Defendants claim of predetermination is based on two occurrences. First, Dr. Cates and Dr. Malito, the superintendent of District 211, met with defendants in October 2003 and told them that the District would be recommending at the upcoming November 5 IEP meeting that Lindsey be placed in Lake Park High School, a special education high school. Vol. 26 at 9902-03. Second, on the day of the actual IEP meeting, the District had attorneys standing by at the federal courthouse ready to suit and seek an injunction if the defendants refused to agree to a change in placement. Vol. 23 at 5230. Defendants assert that this evidence makes it clear that Lindsey's placement change was predetermined.

Defendants' argument fails because school districts are permitted to prepare for IEP meetings, including drafting proposals and thinking about the appropriate placement recommendation. Drafting an IEP in advance of the IEP meeting is "not cause for concern, as nothing in the IDEA or its regulations prohibits school districts from coming to an IEP meeting with tentative recommendations for its development prepared in the parents' absence." *Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 657 (8th Cir. 2000). In fact, though the IDEA regulations state that parents have a right to participate in meetings regarding their child's placement, they provide that the term "meetings" does "not include preparatory activities that public personnel engage in to develop a proposal or response to a parent proposal that will be discussed in a later meeting." 34 C.F.R. § 300.501(b)(1)-(2). In testimony before the IHO, Dr. Cates, the director of special education for the District, made it clear that, though the District prepared for the IEP meeting, it was open to hearing and considering proposals made by the

parents and other attendees.[6] Vol. 23 at 5230. Trudy Lane, the special education department chair at Conant, testified that it is a common practice for the District to put together a draft IEP before an IEP meeting. Vol. 23 at 4817-18.

In addition, the Settlement Agreement specified that if the panel members could not come to an agreement over Lindsey's return to Conant, either the school district or Lindsey's parents could take the issue to this Court or request an administrative hearing. Though there is a dispute about whether the panel still existed on November 5, 2003, it is undisputed that the panel never formally dissolved and that the panel members did not agree on the appropriate placement by November 5, 2003, when the District filed suit. In addition, and perhaps more importantly, the decision to file the lawsuit was made by Dr. Cates; members of Lindsey's IEP team, such as Trudy Lane, the team's coordinator, had no knowledge of the plan to file suit if an agreement was not reached at the IEP meeting. Vol. 23 at 4818-19.

School officials must come to the IEP table with an open mind, but they need not come with a blank mind. *Doyle v. Arlington County School Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992). The fact that the District had attorneys standing by to file suit is not enough by itself to

---

[6] During the administrative hearing, Dr. Cates was asked whether the District decided before the November IEP meeting to transfer Lindsey to a special education school and to file an injunction if the parents did not agree to the transfer. Cates responded:

> No, there was no - there was no agreement. There was no idea about where things were going. We were hoping for an agreement between the parties. We were hoping that the two parties would see eye to eye about what - you know, I didn't know what that would be, whether that would be the return to Conant or a return to somewhere else. I had no idea what that would be. If there was a lack of consensus among the experts, that was what allowed the trigger to return to court.

Vol. 23 at 5230-31.

show that the District had predetermined Lindsey's placement. The record reflects that Lindsey's needs were discussed at length at the IEP meeting. The fact that the parents' position was not adopted in the meeting does not lead to the conclusion that they were denied input in the placement decision. *White v. Ascension Parish School Bd.*, 343 F.3d 373, 377 (5th Cir. 2003) ("we reject the assertion that parents are denied input into a decision if their position is not adopted").

In short, the administrative record supports the IHO's conclusion that there were no material procedural errors in the formulation of any of Lindsey's IEPs. IHO Decision at 45. Lindsey's parents attended every IEP meeting and every team meeting. Vol. 24 at 6847. They attended the August 2002, August 2003, and November 2003 IEP meetings with their lawyer. IHO's Decision at 45. Defendants had the opportunity for meaningful participation in the IEP meetings, and the evidence shows that they did meaningfully participate in all of the meetings.

### 2. Substantive requirements

Defendants allege that Lindsey's November 2003 IEP was not reasonably calculated to provide Lindsey with educational benefit and therefore violated the IDEA. *See Rowley*, 458 U.S. at 203. The IHO, however, found that the November 2003 IEP, including its proposal to place Lindsey in a self-contained classroom, likely would benefit Lindsey. Defendants argue that the IHO's decision should be overturned because the IEP failed to satisfy the requirements of the IDEA.

The IDEA requires that an IEP contain, among other things, a statement of measurable annual goals; an explanation of the extent to which the child will be educated and participate in activities with nondisabled children; a statement of supplementary aids and services to be

28

provided to the child; and a statement of transition services for students age 14 and older. 34 C.F.R. § 300.347. Defendants argue that the November 2003 IEP, in contrast to prior IEPs, did not contain a set number of minutes per week for occupational therapy, speech therapy, or physical therapy. Vol. 6 at 2239. They also argue that the November IEP did not contain a provision for a functional behavioral analysis, which was recommended by Morris and Belgrade, and does not contain a revised behavioral intervention plan.

Though the November IEP did not contain every recommendation that was discussed at the IEP meeting, it was reasonably calculated to provided Lindsey with educational benefit. It is true that a functional behavioral assessment was not ordered and the behavioral intervention plan was not revised, but the IDEA does not require these elements. In any event, the IHO ordered that once Lindsey is placed in an appropriate school, "the staff shall re-assess the student's IEP, conduct a functional assessment of the student's current behavior and develop an appropriate behavior intervention plan." IHO Decision at 60. Furthermore, though specific durations were not specified for related services, the IEP did state that Lindsey required those services, which this Court finds was sufficient. The preponderance of the evidence supports the conclusion that the November IEP contained all the required elements.

In sum, the District satisfied its burden to provide Lindsey with a FAPE in both spring 2003 and fall 2003. The District did its best to formulate and implement an IEP for a child with a complex disorder that is not fully understood even by scientific and educational experts. When experts disagree as to how best educate a child, as they do in this case, the school district has to review available information and data and exercise its professional judgment as to how best to carry out the child's education. *See also Beth B.*, 211 F. Supp. 2d at 1027 (experts still have only

29

a limited understanding of Rett Syndrome and studies are not sufficient to determine how best to educate students with the disorder). Though the Court respects Lindsey's parents' disagreement with the District's judgment, the District complied with *Rowley* and the IDEA's requirements, which is what the law requires. *Beth B.*, 282 F.3d at 498 ("The Court's rationale behind using this standard was to leave the selection of educational policy and methods where they have traditionally resided - with the state and local school officials.").

### Least restrictive environment requirement

Our analysis does not end with the completion of the *Rowley* test. In fact, we have only just arrived at what appears to be the central issue in this case, namely, whether the District's proposed placement provides an education to Lindsey in the least restrictive environment.

In addition to providing a FAPE, the IDEA obligates a school district to provide the FAPE in the least restrictive environment (LRE). The IDEA mandates that a child may only be removed from a regular classroom setting only if "the nature of severity of the disability is such that education in regular classes with the use of supplementary aides and services cannot be achieved satisfactorily." 34 C.F.R. § 300.550(b)(2). The LRE requirement manifests Congress' strong preference for mainstreaming disabled children. At the same time, it may create some tension with the school district's responsibility to tailor each child's educational placement to her needs.

In deciding whether the District's decision to place Lindsey in a self-contained environment satisfies the IDEA's LRE mandate, the Court cannot turn to the two-part *Rowley* test for guidance. *Beth B.*, 282 F.3d at 498 (*Rowley* applies only to the school district's burden to provide a FAPE; it does not apply to an analysis of whether the student received educational

benefit in the regular classroom); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1045 (5th Cir. 1989); *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983). The Supreme Court has not yet construed the LRE requirement. *Beth B.*, 282 F.3d at 498. There is, however, a body of post-*Rowley* case law analyzing the LRE mandate. These cases have produced three distinct tests for determining compliance with the LRE provision. The *Roncker* test asks the court to determine what makes a segregated placement superior, and then determine whether the services that make the segregated setting superior can feasibly be provided in a non-segregated setting. *Roncker,*700 F.2d at 1063. The *Holland* test requires the court to consider several factors: educational benefits of mainstreaming; the non-academic benefits of mainstreaming; the effect of mainstreaming on the regular classroom teacher and students; and the costs of mainstreaming. *Sacramento v. Rachel H. by Holland*, 14 F.3d 1398, 1400-01 (9th Cir. 1994). The *Daniel R.R.* test asks whether education in the regular classroom with the use of supplementary aids and services can be achieved satisfactorily, and if it cannot, whether the school district's placement mainstreams the child to the maximum extent appropriate. *Daniel R.R.*, 874 F.2d at 1048. The *Daniel R. R.* court stated the factors to be considered are not static, but that relevant factors include whether the state has taken steps to accommodate the child in regular education; whether the child receives benefits from regular education; and the effect of the child's presence on the regular classroom environment. *Id.* at 1048-49.

The Seventh Circuit recently declined to adopt any of three LRE tests, explaining that adopting a specific test was "unnecessary," because the IDEA "provides enough of a framework" for determining LRE compliance. *Beth B.*, 282 F.3d at 499. Rather than use a formal test, the Seventh Circuit stated that in determining the appropriateness of a school district's decision to

remove a student from a regular education placement, the following inquiry should be made: if the student's education at the regular high school was satisfactory, the school district would be in violation of the Act by removing her. If not, if its recommended placement will mainstream the student to the maximum appropriate extent, no violation occurs. *Id.* Thus, the Court's LRE analysis will focus on whether Lindsey's experience at Conant was satisfactory and whether the District's proposed change in placement mainstreams her to the maximum extent appropriate.[7]

There is more than sufficient evidence in the record to support the IHO's conclusion that Lindsey's education at Conant was unsatisfactory. The IHO based her decision in part on the Seventh Circuit's decision in *Beth B.*, as it is the only Seventh Circuit IDEA case dealing with Rett Syndrome,[8] and because the similarities between Beth B.'s and Lindsey's experiences in regular education are striking. Like Lindsey, Beth B. had Rett Syndrome and attended her local mainstream school with the help of a special education teacher, two aides, and a work room. She was also nonverbal, required numerous AT devices, often had to be removed from class because of vocalizations, and was in class only fifty percent of the day.

---

[7]Focus on whether the regular education was satisfactory and whether the proposed placement is appropriate is also consistent with *Rowley*, in which the Court found that the word "appropriate" in the LRE provision "seems to reflect Congress' recognition that some settings simply are not suitable environments for the participation of some handicapped children." *Rowley*, 458 U.S. at 197 n. 21. Similarly, the Seventh Circuit has stated that:

> [t]he Courts have determined that the Act's mainstreaming preference is to be given effect only when it's clear that the education of the particular handicapped child can be achieved satisfactorily in the type of mainstream environment sought by the challengers of the IEP proposed for that child.

*Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 295 (7th Cir. 1988).

[8]The parties have cited no other appellate-level decision under the IDEA involving a child with Rett Syndrome.

The Seventh Circuit found that Beth's education in the local school was unsatisfactory because her academic and developmental progress were virtually nonexistent, despite the use of supplementary devices, such as communication aids, a modified curriculum, and one-on-one teachers and aides. *Beth B.*, 282 F.3d at 499. Beth's parents argued that she benefitted from her time in the regular education setting because she made progress in improving some communication skills. The court held that this "modicum of developmental achievement" did not constitute a "satisfactory education," and thus the school district's decision to place her in a special education environment was appropriate. *Id.*

Lindsey's experience at Conant was very similar to Beth's. Lindsey was not making meaningful progress at Conant. Defendants argue that she made meaningful progress in spring 2003 (when, they contend, the District was properly implementing Lindsey's IEP) by meeting the majority of her IEP goals. This argument is unpersuasive. The evidence reflects that although Lindsey may have been meeting goals in the spring, those goals were being met in her work room with instruction provided by her special education teacher, not in the mainstream education environment. Vol. 21 at 2794. Indeed, school records reflect that Lindsey spent little time in the regular education environment in the spring and fall of 2003. In spring 2003, for example, there were only two days in which Lindsey stayed in English class for the full fifty minutes. IHO Decision at 24. There were many days in which she spent zero to ten minutes in English class. *Id.* at 24-26. In fall 2003, Lindsey's class participation time did not improve, and her curriculum was minimal compared to what the regular education class was covering. *Id.* at 40. Moreover, when Lindsey was in class, peer interaction was minimal, Vol. 20 at 227, and she was disruptive to other students. Vol. 20 at 848. Therefore, as in *Beth B.*, Lindsey was not mainstreamed in

any real sense at Conant, in either the spring or fall of 2003, and she did not gain meaningful educational benefit from her exposure to the regular classroom environment. *Beth B.*, 211 F. Supp. 2d at 1035, *see also* Vol. 20 at 848 (Scott Altergott, one of Lindsey's regular education teachers in fall and spring 2003, testified that Lindsey received no educational benefit in his class in either her sophomore or junior year). Rather, Lindsey was engaged in special education within the regular classroom.[9] *See id.* As a result, the choice between placing Lindsey at Conant or placing her in a multi-needs setting is "not really a choice between regular and special education, but between two forms of special education." *Id.*

Defendants argue that Lindsey's situation is different from Beth's, because Lindsey has much greater cognitive ability and motor skills than Beth. *Beth B.*, 211 F. Supp. 2d at 1024 (Beth was largely wheel-chair bound and her cognition was estimated at one to six years). These are, in fact, important factors to consider in determining the appropriate placement. But the differences in cognition and motor skills between Beth and Lindsey, however, do not affect our conclusion as the IHO found that it was Lindsey's behavior, not her cognitive or motor abilities, that required a change in her placement. IHO Decision at 47.[10]

---

[9]The Court's conclusion is also consistent with the University of Chicago triennial evaluation of Lindsey, completed in 2002, which found:

Despite the IEP and current placement [in Conant], Lindsey is functionally in a self-contained program. Despite the best efforts of staff and peers, Lindsey has few, if any, age-appropriate social interactions. However, the current program is only an approximation of a proper self-contained program as there are too many diversions and distractions to allow for proper behavioral management and training.

Vol. 11 at 03790.

[10]This conclusion was also reached by the triennial evaluation, which concluded that:

Lindsey frequently displayed aggressive or disruptive behaviors in school in the fall and spring of 2003, including intense vocalizations, self injurious behavior, and head-butting staff. It was the existence of these behaviors in Lindsey's case, but not Beth's case, which led the IHO to conclude that Lindsey exhibited "Beth B. plus behavior." IHO Decision at 60.[11] The preponderance of the evidence supports the IHO's characterization of Lindsey's behavior. Lindsey's regular education teachers testified that Lindsey vocalized every day in class in both the fall and spring. Vol. 20 at 802. The vocalizations were disruptive to the class and often caused Lindsey to have to be removed. Vol. 20 at 804. In both the fall and spring, Lindsey exhibited substantial self-injurious behavior. In the spring, when defendants argue Lindsey was participating successfully at Conant, defendants acknowledged that during the thirty five days she attended school, Lindsey engaged in the following behaviors: ninety-three self-injurious behaviors, one attempted strike, six contacts, six attempted head-butts, one actual head-butt, and thirteen vocalizations. The school nurse evaluated Lindsey after two incidents and staff members on four occasions. Vol. 6 at 2100 (school records documents 110 self injurious behaviors, one

---

> In all likelihood, Lindsey is capable of functioning at a much higher level than that which was observed during the current evaluation. While Lindsey has fundamental deficits associated with Rett's Syndrome, it is her behavioral problems that are the most significant issue at the present time as they so dramatically interfere with her functioning. Even though she is said to be in an included setting in school, these behavior problems have led her to be functionally isolated in space and through the intervention of aides. This is not good for Lindsey. In order for her to be successful and be truly included in the social and academic world, her disruptive behaviors must be brought under control effectively and promptly.

Vol. 11 at 03788.

[11]As the IHO put it, "[e]very factor mentioned by the Seventh Circuit in *Beth B.* strongly favors a finding for the District. Furthermore, the student's random aggressive and self-injurious behavior were not issues in Beth B." IHO Decision at 60.

attempted strike, fourteen strikes, twenty-four attempted head butts and two contacts, and thirty-one vocalizations).

In the fall, Lindsey's behaviors deteriorated. For example, on the day Dr. Winnega observed Lindsey, she saw Lindsey hit herself, a teacher, and an aide, and attempt to hit her mother. Vol. 21 at 1954-56. After observing Lindsey, Dr. Winnega came to the conclusion that her program at Conant should "come to a prompt end," because Lindsey needed to placed in sophisticated program that would provide a safe environment for Lindsey and the staff and that would have the means to carry out a sophisticated behavioral program. *Id.* at 1959. On the day that Morris and Belgrade observed Lindsey, her vocalizations were "extreme, almost to the point where class could not continue." Vol. 20 at 230, 236.

Furthermore, Powers testified that Lindsey's vocalizations got worse as the school year progressed and were sometimes so intense that they disrupted nearby classrooms. Vol. 21 at 1503-04, Vol. 20 at 231-232. Her regular education teachers testified that Lindsey's vocalizations disrupted the class and made it difficult for others students to present to the class. Vol. 20 at 228-29, 801 & 852. One teacher also testified that Lindsey had to be physically restrained in his classroom because of disruptive behavior. Vol. 20 at 901.

None of this should be construed, of course, to place blame on Lindsey. The behaviors Lindsey exhibited are a result of her having Rett Syndrome, a highly complex disorder that even experts in the field do not completely understand. Despite the best efforts of Lindsey's family and Conant staff and administrators, however, Lindsey's behaviors have prevented her from gaining any meaningful educational benefit from the regular classroom environment. Furthermore, a traditional high school like Conant lacks the environmental supports needed to

assist Lindsey in controlling her behavior. IHO Clarification at 2. As Judge Moran noted in *Beth B.*, "some services may be *feasible* in regular education, but *more effectively* delivered in a special education setting." *Id.* at 1030 (emphasis added)). The preponderance of the evidence supports the IHO's conclusion that Lindsey's behavioral and education needs require a "highly structured, self-contained setting" that has a "very strong behavioral training capability." IHO Decision at 60.

The IHO recommended Lake Park High School as a school that has capability to handle Lindsey's needs and the Court supports this recommendation. Several experts testified that Lake Park was appropriate for Lindsey, Vol. 21 at 2932 and 2275, because it has a sophisticated behavioral program. Lake Park has reverse mainstreaming opportunities, *id.* at 2276, and allows for integration into the regular education environment, such as eating lunch with regular education students. *Id.* at 2275, 2277. Therefore, Lindsey's attendance at Lake Park High School would still provide her with the chance to spend time with her regular education peers. In upholding a similar type of placement, the Seventh Circuit in *Beth B.* stated that because the school district's proposed special education placement, included reverse mainstreaming and the opportunity to spend time with nondisabled peers, it was "at an acceptable point along the 'continuum of services' between total integration and complete segregation." *Beth B.*, 282 F.3d at 499 (citing 34 C.F.R. § 300.551). The District's proposed placement at Lake Park likewise represents an appropriate point along the continuum of services for Lindsey and satisfies the IDEA's requirement that she be mainstreamed to the maximum extent appropriate.

The Court has the utmost respect for defendants' belief that Lindsey should be educated with her nondisabled peers. But parents, no matter how well-motivated they are, are not entitled

to compel a school district to implement a specific placement in providing for the education of their child. *Lachman*, 852 F.2d at 297. The preponderance of the evidence supports the conclusion that Lindsey gained no meaningful educational benefit from her time at Conant and that she would be better served in a multi-needs school, as proposed by the District.

## Settlement Agreement

The Court determined that the settlement agreement between the District and defendants was valid and enforceable in November 2003. Vol. 17 at 6054. The Court also held that the issue of whether the settlement agreement was breached was an issue to be decided by the IHO. *Id.* at 6052. As a result, one of the questions the defendants asked the IHO to decide was whether the District violated the agreement by failing to develop appropriate IEP and failed to implement necessary staff training in behavior management strategies. IHO Decision at 2.

It is not clear from the IHO's decision, however, that she ruled on the question of whether the District breached the settlement agreement. The Court will therefore decide the issue from scratch.

Defendants assert that the District violated § 4(b) of the Agreement, which required that Lindsey's IEP include strategies for promoting engagement in social activities, if engagement in social activities was recommended by the expert panel. Vol. 5 at 1954. The panel did recommend socialization for Lindsey, but the District never incorporated a socialization goal in her IEP, nor did it encourage socialization. Vol. 21 at 2800. Defendants also contend that the District violated section 4(b)(ii), which required the District to incorporate an updated technology evaluation into Lindsey's IEP. Vol. 6 at 1955. The evaluation was not completed for approximately four months after the Agreement was signed. Vol. 13 at 04425. In addition,

section 7 stated that the District was agreeing to encourage and support all means of communication for Lindsey. Vol. 6 at 01957. Defendants argue that the District did not support Lindsey's means of communication and did not develop new means of communication. Section 5 of the Agreement required the District to develop a preliminary plan for Lindsey's return to Conant and to train staff working with Lindsey on behavior management and Rett Syndrome. Vol. 5 at 1956. Defendants assert that the training done in the fall of 2003 was too limited and that no preliminary plans for Lindsey's return in the spring were ever developed. Finally, defendants argue that the District violated the provisions of the Agreement which required the District to consult with expert panel. Vol. 5 at 1959, 1950-52. The panel made several recommendations that, according to defendants, the District did not implement. These recommendations included a statement that Lindsey needed consistent staff and consistent access to communication; defendants note that Lindsey had a new teacher and aides in the fall and contend that these staff members did not provide Lindsey with consistent access to communication devices.

Under general principles of common law, a party suing for breach of contract must prove she was damaged by the breach. *See, e.g., Green v. Trinity Int'l Union*, 344 Ill. App. 3d 1079, 1085, 801 N.E.2d 1208, 1213 (2003). Defendants argues that a breach of the settlement agreement in and of itself amounts to a denial of FAPE. Defs' Mem. at 34. One of the cases they cite supports this proposition but cites no authority. *Reid v. School Dist. of Philadelphia*, No. Civ. a. 03-1742, 2004 WL 1926324, *4 (E.D. Pa. Aug. 27, 2004). The other case defendants cite, *E.D. ex rel. Dukes v. Enterprise City Bd. of Educ.*, 273 F. Supp.2d 1252 (M.D. Ala. 2003), says something altogether different: breach of a settlement agreement regarding special

education entitles the non-breaching party to relief only if the breach results in a denial of FAPE. *Id.* at 1260. In so ruling, the court analogized a breach of a settlement agreement to a procedural violation of the IDEA. *Id.* In the Eleventh Circuit, a procedural violation entitles a plaintiff to relief only if resulted in harm. *Id.* (*citing Doe v. Alabama State Dept. of Educ.*, 915 F.2d 651, 663 (11th Cir. 1990)). Thus, the court in *E.D.* found that the Eleventh Circuit would similarly find that a violation of a settlement agreement results in a violation of FAPE only if it results in harm to the student. The Court believes the approach taken in *E.D.* is the appropriate one in this case, particularly in light of the fact that the Seventh Circuit, like the Eleventh Circuit, has held that a plaintiff is entitled to relief for procedural violations of the IDEA "that result in the loss of educational opportunity." *Michael M.*, 356 F.3d at 804 (7th Cir. 2004). The primary purpose of the settlement agreement was to put the parties' past disputes behind them and to put in place a process for ensuring that Lindsey received a FAPE. Under these circumstances, as was the case in *E.D.*, the Court does not believe that a breach of the settlement agreement, without some showing of harm consisting of loss of a FAPE, entitles the defendants to relief.

Though the District may not have complied with the precise letter of every single provision of the settlement agreement, the totality of circumstances show that the IEP it formulated and carried out for Lindsey was reasonably calculated to provide her with educational benefit. *Rowley*, 458 U.S. at 207. The Court has already explained that the four month delay in the AT evaluation did not impair Lindsey's education at Conant in the spring or fall of 2003. Likewise, the fact that Powers and her aides may not have provided Lindsey with a communication device in every possible situation did not result in Lindsey being denied a FAPE.

Other violations of the agreement alleged by defendants were the result of changing

circumstances. A settlement agreement regarding a child's IEP must be flexible to be consistent with the changing needs of the child. *W.L.G. v. Houston County Bd. of Educ.*, 975 F. Supp. 1317, 1329 (M.D. Ala. 1997) (IDEA requires that an IEP be revised no less than annually, therefore, "a settlement will most often be tentative only, for it must always be subject to change" to meet the needs of the disabled child). The District had to act not only in compliance with the agreement, but also had to make Lindsey's IEP work under changing circumstances. For example, defendants argue that the fact that Lindsey had a new teacher and new aides in the fall violated the agreement, because the expert panel advised the District that Lindsey needed consistent staff. The reason Lindsey had a new teacher in the fall, however, had nothing to do with any non-compliance of the District; rather, Lindsey's spring 2003 teacher, Jean Mansfield Link, chose to leave Conant for another job. When Link left, the District decided not to rehire Link's aide, which was reasonable based on the aide's record of absences. Vol. 21 at 2434. In addition, defendants argue the District violated the agreement by failing to promote socialization and socialization groups, such as Circle of Friends, for Lindsey. The reason the District did not include Lindsey in groups like Circle of Friends was that staff working with Lindsey did not think it was safe, considering her erratic and sometimes aggressive behavior. Vol. 21 at 1684; Vol. 20 at 851. This, too, was a reasonable determination.

In short, though the District may not have carried out certain provisions of the settlement agreement to the letter, Lindsey was not harmed and was not denied a FAPE as a result of these failures. Defendants therefore are not entitled to any relief based on their claim the settlement agreement was breached.

## Procedural challenges to the IHO's Decision

Defendants argue that the IHO made significant errors requiring reversal of her decision, including making improper credibility determinations, failing to address all of the issues raised at the hearing, misapplying the burden of proof, disregarding testimony without explanation, preventing defendants from presenting evidence of a hostile environment at Conant, committing improprieties during the hearing, and allowing a particular expert to testify on the District's behalf.

## 1.    Claims relating to the IHO's treatment of testimony and issues in her opinion

Defendants seek to challenge the IHO's decision on the ground that she failed to address all of the issues and testimony raised at the hearing. This challenge is without merit. The IHO wrote a detailed sixty-two page opinion and a three page clarification in which she thoroughly addressed the relevant witness testimony. The IHO had the opportunity to observe the witnesses and use her experience to make credibility judgments. The fact that the IHO credited some witnesses over others and chose not to address every witness' testimony in her opinion is not a basis to overturn her decision.[12] The bottom line is that there is more than enough evidence and testimony to support the IHO's decision, including her credibility determinations. Furthermore,

---

[12]Defendants cite *Blount v. Lancaster-Lebanon Intermediate Unit*, No. 03 C 579, 2003 WL 22988892 (E.D. Pa. Nov. 25, 2003) as standing for the proposition an IHO's decision should be overturned if the IHO disregarded some testimony and adopted other testimony without explanation. The outcome in that case, however, was based on the court's determination that the IHO ignored the burden of proof and the failure to "make credibility determinations among the various witnesses and contrary expert opinion." *Id.*, *12. *Blount* does not govern the present case, for several reasons. First, as will be discussed, the IHO did properly state and apply the burden of proof at the hearing. Second, the hearing in *Blount* was only three days and consisted only a few witnesses. The hearing in the case was forty-two days and consisted of over twenty witnesses. It would impose an undue burden to require the IHO to explain in fine detail each and every witness' testimony, her assessment of its credibility, and how it contributed to her conclusion. Finally, the IHO did address contrary opinions in her decision. The fact that she did not credit those opinions does not undermine her decision.

42

the witnesses she did credit included two of three members of the expert panel and teachers who had worked with Lindsey. Contrary to defendants' contentions, these were witnesses who had specific experiences working with Lindsey at school, at home, and in a clinic. *See Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1058 (7th Cir. 1997).

Defendants argue that the IHO also failed to address all of the issues defendants raised. At the prehearing conference with the IHO in December 2003, defendants raised the following issues for consideration:

1. The parents allege that the District violated the settlement agreement in several ways, including failing to develop an appropriate IEP, failing to properly train staff, and failing to follow advice from the expert panel in developing and implementing behavior analysis and intervention plans;
2. The parents allege that the least restrictive environment for Lindsey is Conant, and therefore by removing her from Conant, the District has violated the IDEA;
3. The parents allege that the District excluded Lindsey from using the Conant swimming pool; and
4. The parents allege that at no time subsequent to the settlement agreement did the District provide Lindsey with a FAPE.

IHO Decision at 1-2.

The IHO directly addressed the issue of Lindsey's placement and IEP development. As we have discussed, the IHO did not directly address the issue of the settlement agreement. The IHO likewise did not address Lindsey's exclusion from the pool. And finally, defendants assert that the IHO improperly bypassed a FAPE determination and proceeded directly to an LRE determination. Defendants argue this violated their right to present complaints regarding Lindsey's FAPE. 20 U.S.C. § 1415(b)(1)(E); ILCS § 5/14-8.02(a).

Though the IHO may have failed to address directly some of the issues raised at the hearing, this is not grounds to overturn her decision. Defendants were not deprived of their due

43

process rights. The defendants were given a forty-two day hearing in which both parties had extensive opportunities to present their arguments and testimony.

## 2. Burden of proof

Defendants argue that the IHO's decision should be overturned because the IHO misapplied the burden of proof. At the administrative level, the school district bears the burden of proving that the proposed IEP complies with the IDEA. According to defendants, the IHO improperly shifted the burden of proof to them as Lindsey's parents.

Defendants argument fails because it is based on a misunderstanding of the meaning of the District's burden of proof at the administrative hearing. The District did not have to prove that its placement was superior to Lindsey's prior placement at Conant. *See, e.g., Beth B.*, 211 F. Supp. 2d at 1028 ("The district does not have to prove its placement is pedagogically superior to the parents."). Rather, the District had the burden of showing that its placement was likely to benefit Lindsey. The District presented more than enough evidence to satisfy its burden, including the testimony of two of the three members of the expert panel, Lindsey's regular education teachers, and school administrators.

## 3. Claims related to procedural errors

Defendants argue that the IHO committed a significant procedural error when she allowed the District to present testimony from Richard Van Acker. Dr. Van Acker studies Rett Syndrome at the University of Illinois at Chicago. Van Acker was permitted to testify, but only with regard to Rett Syndrome, not Lindsey in particular. The root of defendants' concern about Van Acker is his testimony in the *Beth B.* case. In the *Beth B.* administrative hearing, Van Acker testified for the school district in favor of a segregated placement. When the District and

44

Lindsey's parents were engaged in settlement negotiations in fall 2002, the parents made it clear that they did not want the District to be able to consult Van Acker in regards to Lindsey's case in any way. Vol. 5 at 1937. The District, however, refused to agree to a provision in the settlement agreement that would prevent them from working with Van Acker. Vol. 5 at 1939. Defendants argue that the District made a "side settlement agreement" when attorneys for the District wrote in a letter to attorneys for defendants that "Dr. Van Acker is not now involved; is not on our witness list; and has not been contacted concerning this case. However, we will not agree to language barring consultation of any expert we want to use. If anyone new comes up vis a vis Lindsey, we'd have to notify your clients and get their permission anyway and everyone knows they won't give their permission for Van Acker." Vol. 5 at 1939. The settlement agreement provides, however, that the "parties agree that each party is entitled to use whatever qualified expert or experts that party trusts and with whom the party feels comfortable." Vol. 5 at 1960. Thus, the settlement agreement itself does not bar the use of Dr. Van Acker's expertise. The letters between counsel were written before the settlement agreement and do not constitute a separate settlement, or "side agreement," as it was referred to by defendants. *See* Vol. 5 at 1963-64 (settlement agreement represents parties' complete understanding, and all prior agreements are merged therein). The District's use of Dr. Van Acker's testimony regarding Rett Syndrome did not violate the settlement agreement.[13]

Finally, defendants argue that the IHO improperly prevented defendants from presenting evidence of past behavior of District 211 administrators which allegedly would have shown its

---

[13]The Court in no way relied upon Dr. Van Acker's testimony in coming to the conclusion that the District's placement decision was appropriate.

bad faith in implementing Lindsey's program. This argument is based on the IHO's rulings to exclude testimony of Ed Rafferty, the Superintendent of School District 54, where Lindsey attended elementary and junior high schools, and to exclude evidence of the ISBE rankings of Illinois school districts, which allegedly would have shown that District 211 is one of the least inclusive districts in the state.

Defendants' argument regarding Ed Rafferty is a non-starter, as this Court allowed defendants to depose Rafferty after the hearing and admit his deposition along with Lindsey's school records from district 54 into the record. The Court reviewed Rafferty's testimony and concluded that it did not require the IHO's decision to be overturned. Defendants, therefore, were not prejudiced by the IHO's decision to exclude Rafferty's testimony.

Finally, the IHO's decision to exclude the ISBE rankings was also appropriate. The IHO wanted the hearing to focus specifically on Lindsey and her unique experience at Conant. Because the purpose of the hearing was to determine the appropriateness of Lindsey's placement, the IHO's decision was not unreasonable and does not warrant reversal of her decision.

### ADA and Section 504 claims

Defendants claim that in addition to violating the IDEA, the District also violated the Americans with Disabilities Act and section 504 of the Rehabilitation Act. The Court's ruling that the District did not violate the IDEA in placing Lindsey in a self-contained, special education setting also requires denial of defendants' ADA and Rehabilitation Act claims. In addition, as the District argues, defendants have offered no evidence from which a fact finder reasonably could determine that the District intentionally discriminated against or failed to accommodate Lindsey based on her disability. *See Beth B.*, 211 F. Supp. 2d at 1035.

46

### Third Party Defendant Illinois State Board of Education

The defendants brought a third party claim against the Illinois State Board of Education, charging the ISBE with violating the IDEA, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973, by failing to ensure that School District 211 complied with the LRE mandate of the IDEA and by failing to provide a fair administrative hearing process. Because the Court has found against defendants on their claims of noncompliance by District 211, defendants likewise cannot prevail on their claims against the ISBE.

### Conclusion

For the reasons stated above, the District's motion for summary judgment [docket no. 44] granted, and defendants' motion for summary judgment [docket no. 69] is denied. Defendants' motion to strike [docket no. 91] is granted. Third party defendant's motion to dismiss [docket no. 59] is terminated as moot. The Clerk is directed to enter judgment in favor of the plaintiff and the third party defendant, and against the defendants.

_____
MATTHEW F. KENNELLY
United States District Court

Date: August 15, 2005

47